FILED BY _____ D.C.

APR - 9 2026

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

MIAMI DIVISION

Case No. _____

STEVE MORALES,
an individual,

        Plaintiff,

vs.

ENRIQUE MIGUEL IGLESIAS PREYSLER,
an individual;
E.I. PRODUCTIONS, LLC,
a Florida limited liability company; and
DOES 1 through 10, inclusive,

        Defendants.

_____/

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Steve Morales (**"Morales"**), proceeding pro se, brings this Complaint against Defendants Enrique Miguel Iglesias Preysler (**"Iglesias"**) and E.I. Productions, LLC (**"E.I. Productions"**), and alleges as follows:[1]

### I.      PRELIMINARY STATEMENT

1.    *Steve Morales is a Grammy Award-winning producer and songwriter* whose credits span more than thirty years, including *Enrique Iglesias, Céline Dion, Christina Aguilera, Marc Anthony, and Ricky Martin*. On the *Escape* album—certified Diamond by the RIAA, more than ten million units sold—Morales co-wrote and produced "Escape," "Don't Turn Off the Lights," and five other recordings. Those seven masters were the foundation of Iglesias's commercial empire. Iglesias has sold **over 180 million albums worldwide** and holds the **Billboard record as the largest-selling male solo artist in history**. When Influence Media Partners acquired his entire recorded music catalog in December 2023 for nine-figure consideration—backed by Warner Music Group and BlackRock— what they purchased was built on recordings Steve Morales produced. The written producer

---

[1] Morales proceeds pro se pursuant to 28 U.S.C. § 1654. All allegations are based on personal knowledge, documentary evidence, or information and belief as noted. This filing complies with Fed. R. Civ. P. 11.

*Morales v. Iglesias et al.* | Case No. _____

agreements Morales and Iglesias signed between 2000 and 2004 (the **"Producer Agreements"**) required Iglesias to direct 25% of all royalties on those masters to Morales, prohibited modification without Morales's signature, and entitled Morales to a proportionate share of any audit recovery Iglesias obtained from his distributor. Iglesias violated all three obligations—and then sold the catalog for nine figures.

2.      The pattern began in 2005, when Iglesias conducted a royalty audit of UMG using Gelfand, Rennert & Feldman and sat on the findings for *nine years* without telling Morales. In 2013, Morales discovered the underpayment on his own, commissioned his own audit documenting over 3.1 million unreported units and **$682,134 in minimum unpaid royalties**, and filed suit. In July 2015, Iglesias settled for $140,000 and signed a Settlement Agreement whose Section 5 expressly provided: *"Nothing contained herein shall affect Morales's right to continue to receive producer royalty statements and producer royalty payments."* Morales relied on that written promise. Within two years, Iglesias broke it.

3.      Beginning no later than March 2017—the same month Iglesias sent UMG a formal audit demand calling their royalty reduction "unsupportable and unfathomable"—Iglesias caused Morales's SoundExchange allocation to be reduced from 25% to an effective 6.25% without Morales's knowledge, without his consent, and without any writing signed by him. The SoundExchange portal continued to display "25%." The system represented one allocation and paid another. Morales calls this the **"Logic Flip—applying 25% to a reduced sub-share rather than gross (producing effective 6.25%)."** It violated the Producer Agreements' dual-signature requirement and Section 5's written preservation of Morales's royalty rights. When SoundExchange finally confirmed the concealed mechanism in writing on April 23, 2025, it admitted Morales had been receiving 25% of Iglesias's 25%—an effective 6.25%—retroactively applied, with *no Morales-signed authorization ever produced.*

*Morales v. Iglesias et al.*  | Case No. _____

4.      While Morales's royalty stream was suppressed, Iglesias monetized the catalog twice. In November 2020, songs from the Iglesias catalog—including those Morales produced—were sold as part of a $322.9 million Hipgnosis acquisition. In December 2023, Iglesias sold his *entire* recorded music catalog to Influence Media Partners—backed by Warner Music Group and BlackRock—for **nine-figure consideration**. Iglesias's manager Fernando Giaccardi told Bloomberg that sellers "could've gotten more money" but chose the buyer for the relationship. No disclosure was made to Morales. No reserve was established. No portion of the proceeds was escrowed for his contractual producer interest. Morales's payments stopped. By June 2024, a court-ordered Writ of Possession removed him from his home. He borrowed $18,000 at 30% interest to survive. When he demanded an explanation, Iglesias's attorney John Branca told him he was owed nothing—citing a settlement whose Section 5 expressly preserved the very rights Branca claimed were extinguished.

## II.      PARTIES, JURISDICTION, AND VENUE

5.      Plaintiff **STEVE MORALES** is a Grammy Award-winning music producer and songwriter and a citizen of Florida residing in Miami-Dade County. He holds producer and co-writer credits on recordings that have sold over 120 million albums worldwide.

6.      Defendant **ENRIQUE MIGUEL IGLESIAS PREYSLER** ("Iglesias") is an individual domiciled in Miami-Dade County, Florida. He is the featured artist on the Subject Recordings, the counterparty to the Producer Agreements, the signatory to the April 17, 2014 LOD, and the party who received nine-figure consideration from the December 2023 catalog sale and a multimillion-dollar recovery from his UMG litigation—without paying Morales his contractual proportionate share of either.

7.      Defendant **E.I. PRODUCTIONS, LLC** ("E.I. Productions") is a Florida limited liability company managed and controlled by Iglesias. SoundExchange records reflect *$21,347.29 directed to E.I. Productions and $0.00 to Morales* across 591 consecutive statement rows from Q1

- 3 -

*Morales v. Iglesias et al.*   | Case No. _____

2002 through Q4 2013. (Ex. F.) Those funds were part of the royalty stream assigned to Morales under the Producer Agreements and the 2014 LOD.

8.      Defendants **DOES 1 through 10** are persons or entities whose identities are presently unknown, including without limitation any user, submitter, or intermediary involved in the March 2017 reconfiguration or the subsequent routing of Morales's royalty stream. This includes, upon information and belief, Juan Carlos Sanchez—whom Iglesias's own counsel identified in writing as the "SoundExchange point man" for Iglesias's account—and Fernando Giaccardi, Iglesias's personal manager, who confirmed possession of the 2005 GLF audit materials and refused to produce them, and who participated as a seller-side principal in the December 2023 catalog transaction. Morales will amend when their identities are ascertained through discovery.

9.      Nonparty **SOUNDEXCHANGE, INC.** is the statutory collective designated to distribute digital performance royalties under 17 U.S.C. § 114. SoundExchange is not a defendant and is not a necessary party under Fed. R. Civ. P. 19: complete relief can be granted against Iglesias and E.I. Productions without SoundExchange's presence because the claims arise from Iglesias's unauthorized direction—not from SoundExchange's independent conduct. *SoundExchange does not independently alter featured-artist royalty allocations.* Every LOD configuration change must originate from the artist-side account holder or their authorized agents; SoundExchange implements what it receives. SoundExchange received the 2014 LOD and confirmed in writing that Morales's allocation was reduced and applied retroactively without identifying any Morales-signed authorization. (Exs. B, C, E.) The audit trail identifying who submitted the March 2017 reconfiguration and under whose authority remains in SoundExchange's custody. Morales will serve SoundExchange with a Rule 45 subpoena to obtain that record.

10.      This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because Morales asserts a claim under 17 U.S.C. § 1202. This Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b)(2)

*Morales v. Iglesias et al.* | Case No. _____

because Iglesias resides in Miami-Dade County and a substantial part of the acts and injuries giving rise to Morales's claims occurred in this District. ***Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)**.

### III.   DEFINITIONS

***"Featured-Artist Royalties"*** means the digital performance royalties payable under 17 U.S.C. § 114 to the featured recording artist for exploitation of a Subject Recording.

***"Letter of Direction"*** *or* ***"LOD"*** means the SoundExchange instrument, executed April 17, 2014, by which Iglesias directed SoundExchange to pay 25% of Featured-Artist Royalties on the Subject Recordings to Morales's designated payee. The LOD was not a voluntary accommodation — it was a contractual obligation under paragraph 7(a) of the Producer Agreements.[2]

***"Logic Flip"*** means the reconfiguration, implemented no later than March 2017, by which Morales's 25% allocation was applied not to Iglesias's full Featured-Artist share but only to a sub-pool representing 25% of that gross share, producing an effective 6.25% payout while the SoundExchange portal continued to display "25%."[3]

***"Producer Agreements"*** means the written producer agreements executed between Morales and Iglesias between 2000 and 2004 covering the Subject Recordings, including agreements dated November 13, 2000, January 1, 2001, and February 12, 2001. (Ex. A.) Paragraph 13 prohibits modification absent a writing signed by both parties.[4]

---

[2]Paragraph 7(a) of the Producer Agreements provides: "I shall use reasonable efforts to cause Distributor to account for and pay the royalties earned by you hereunder directly to you... and in that regard, I agree to execute and deliver to Distributor a letter of direction substantially in the form of Exhibit B attached hereto." The LOD was not a voluntary accommodation. It was a contractual obligation.

[3]The Logic Flip is so named because the SoundExchange portal displayed 25% while the payment-processing logic executed 6.25%—a divergence that cannot occur by accident or system error. The standard SoundExchange LOD form requires written revocation by the artist to terminate. No written revocation signed by Morales has been produced or identified.

[4]Paragraph 13 of the Producer Agreements provides: "This document sets forth the entire agreement between you and me with respect to the subject matter hereof and may not be modified except by a written agreement signed by you and me." Any unilateral change to the allocation—including the March 2017 Logic Flip—is void ab initio.

- 5 -

*Morales v. Iglesias et al.* | Case No. _____

"*Settlement Agreement*" means the Mutual General Release and Settlement Agreement executed July 20, 2015. Section 5 expressly provides that nothing therein shall affect Morales's right to continue to receive producer royalty statements and payments. Every claim asserted here post-dates that release.[5]

"*Subject Recordings*" means the ten sound recordings listed in Schedule A, corresponding to 34 SXIDs, covered by the Producer Agreements and the April 17, 2014 LOD. (Exs. A, B, E.)

"*SXID*" means a SoundExchange unique recording identifier. A single composition may correspond to multiple SXIDs. Allocation changes at the SXID level are invisible to a payee viewing only aggregate account-level statements.

**IV.   FACTUAL BACKGROUND**

**A.   *The Producer Agreements: What the Contract Required***

11.     Between 2000 and 2004, Morales and Iglesias executed the Producer Agreements covering the Subject Recordings. Those agreements required: producer royalties on all exploitations of the masters; anti-dilution protection; direct-payment obligations; audit rights; written-modification requirements; and, critically, three provisions that define this lawsuit.

12.     First, paragraph 7(a) required Iglesias to execute and deliver to his distributor a letter of direction directing payment of producer royalties directly to Morales—"in a manner and at times no less favorable to you than as provided in the Distribution Agreement." The LOD was not optional. It was the contractual mechanism by which Iglesias fulfilled his payment obligation.

13.     Second, paragraph 13 prohibited modification of any term "except by a written agreement signed by you and me." Any change to Morales's allocation without his signature was void

---

[5]The Settlement Agreement is invoked solely to establish: (a) Section 5's express preservation of Morales's ongoing royalty rights; and (b) that Iglesias extracted a release through a written promise he had already determined to break. Morales does not seek to set aside the Settlement. Every claim asserted here post-dates the July 20, 2015 effective date.

the moment it was made. The March 2017 Logic Flip—implemented without any writing signed by Morales—was a nullity under the contract Iglesias signed.

14.     Third, paragraph 7(c) entitled Morales to "his proportionate share of any net audit recovery" in the event Iglesias conducted an audit of his distributor's books. That provision became critical in 2018 when Iglesias filed suit against UMG in this District and ultimately collected a multimillion-dollar recovery on the same masters Morales produced. Morales produced seven of the thirteen songs on *Escape*—53.8% of the album by track count. His proportionate share of the $682,134–$745,502 in documented underpaid royalties alone is approximately *$401,000*—nearly three times the $140,000 he accepted in the 2015 settlement. That figure does not include his share of any additional UMG recovery from Iglesias's 2018 litigation. Iglesias paid him nothing under paragraph 7(c).[6]

## B.     *The Audit, the 2014 Lawsuit, and the Settlement*

15.     In 2005, Iglesias engaged Gelfand, Rennert & Feldman to audit UMG's books. GLF prepared an audit report dated December 14, 2005 documenting substantial underpayments. Iglesias sat on that report for nine years. His own Settlement Agreement recitals confirm it: "Iglesias did not pursue the audit claim further." (Ex. Q, §§ 2.2–2.4.) He never told Morales.

16.     In 2013, Morales exercised his own audit rights and commissioned independent calculations. The results were concrete: UMG had publicly reported RIAA-certified sales of over 10 million units on *Escape*, but royalty payments to Morales corresponded to only approximately 5.4 million units—leaving *over 3.1 million units unreported*, representing a minimum of *$682,134 in unpaid royalties* at the weighted average unit rate. The audit further documented *$24,000 in overrecoupment* on the very first royalty statement and *$21,715 in unauthorized marketing chargebacks*. UMG's own ledger reflects a $30,000 deduction on March 24, 2005 described as

---

[6]Paragraph 7(c) of the Producer Agreements provides: "In the event that I conduct an audit or examination of Distributor's books and records in respect of any particular royalty statement pertaining to the Masters produced hereunder, and you shall be paid your proportionate share of any net audit recovery." Iglesias collected a multimillion-dollar recovery from UMG. Morales received nothing.

*Morales v. Iglesias et al.* | Case No. _____

"deducted from Morales royalties for *'Haynes v. Iglesias'*"—taken without any writing signed by Morales. (Exs. G, I, II.)

17.     In November 2014, Morales filed suit in Los Angeles Superior Court (Case No. BC 564 802) alleging breach of the Producer Agreements and demanding his proportionate share of Iglesias's audit recovery under paragraph 7(c). On July 20, 2015, Iglesias settled for $140,000. Section 5 of the Settlement Agreement expressly preserved Morales's right to continue receiving producer royalty statements and payments. The release covered claims only through the settlement's effective date. Every act alleged here occurred after July 20, 2015.

**C.      *The LOD: Three Attempts, One Obligation, One Signature***

18.     **The April 2014 LOD was not the first attempt.** In 2010, Morales sought an LOD directing 25% of Iglesias's Featured-Artist royalties to him. Iglesias refused. In 2012, Morales sought the same authorization. Iglesias again refused. Each refusal preserved E.I. Productions as the sole payee. The April 2014 LOD—executed after Morales filed his audit demand and quantified $800,000 in underpayments—was the third attempt and the first Iglesias signed. He did not sign it as a favor. Paragraph 7(a) of the Producer Agreements required it.

19.     For approximately two years after execution, SoundExchange paid Morales at the directed 25% rate with no disputes, no corrections, and no negative-balance debits—generating approximately $877 per quarter on average, with "Escape" alone producing over $400 per quarter. That uninterrupted two-year payment history confirms the LOD was valid, operative, and functioning as the contract required. The only version of the LOD Morales saw before litigation—filed by Iglesias's counsel in *Case No. 2025-019284-CA-01*—contains an annotation "Prospective payments Only" in handwriting distinct from the execution signature, and reflects a SoundExchange address from a substituted template with an artist-revocation clause not disclosed during negotiations. (Exs. B, R.)

**D.      *The Logic Flip: March 2017, No Signature, No Authorization***

- 8 -

*Morales v. Iglesias et al.* | Case No. _____

20.     Beginning no later than March 2017, Morales's 25% allocation was reconfigured to an effective 6.25% payout while the SoundExchange portal continued to display "25%." ***Morales never signed any writing authorizing that reduction.*** (Ex. C.) Paragraph 13 of the Producer Agreements required his signature to modify any term. None was ever produced or identified.

21.     SoundExchange later confirmed in writing that Morales ***"was getting 25% of the total"*** but is now ***"only receiving 25% of Enrique Iglesias' 25% share"***—an effective 6.25%, applied retroactively, meaning Morales was debited for the difference. (Ex. C.) SoundExchange's Joseph Lewelling confirmed the reconfiguration on April 23, 2025, and stated that additional LODs from other payees would be required for Morales to receive 25% of gross. The financial injury is concrete: on the December 2022 SoundExchange statement, Morales received ***$137.57***—exactly 6.25% of gross. His correct 25% share was ***$550.27***. That ***$412.70 single-quarter shortfall***, applied across all 34 SXIDs every quarter from March 2017 through the present, defines the minimum scope of the diversion.

22.     SoundExchange also used "Bailando"—a recording Morales did not produce, not listed on the 2014 LOD, and not a Subject Recording—as the basis for cross-title negative-balance debits against Morales's account, driving quarterly distributions negative: September 2022 (−$7.64), December 2022 (−$14.12), March 2023 (−$50.19). (Ex. D.) SoundExchange's own Associate Director confirmed in writing on April 9, 2025 that no signed LOD from the Bailando collaborators directed payment to Morales. (Ex. FF.) SoundExchange's Deputy General Counsel confirmed on November 4, 2025 that Morales ***"will begin receiving royalties again once his earnings for the listed recordings exceed the amount he was incorrectly paid for Bailando."*** SoundExchange is withholding Morales's royalties on recordings he produced to satisfy an alleged debt on a recording he did not produce—without legal authorization.[7]

---

[7]SoundExchange Associate Director Tiara Guy confirmed in writing on April 9, 2025 that SoundExchange had no signed LOD from the Bailando collaborators directing payment to Morales. (Ex. FF.) The Bailando cross-title debits were applied without any instrument authorizing them.

*Morales v. Iglesias et al.* | Case No. _____

23.     On March 19, 2026, SoundExchange's counsel admitted in writing that SoundExchange had *"recently been unable to locate a copy"* of the 2014 LOD—while nevertheless continuing to route Morales's allocation at reduced rates. Despite that admission, SoundExchange: (a) refused to restore Morales's allocation to 25%; (b) disabled Morales's portal access to the Negative Balance Report within 48 hours of a written preservation demand; (c) continued distributing Morales's allocation to Influence X Music II-A LP with no signed authorization; and (d) made zero payments to Morales in the November and December 2025 distribution cycles. (Exs. C, D, CC.)

### E.     *The UMG Litigation: He Called the Identical Mechanism Indefensible*

24.     On January 24, 2018—while the Logic Flip against Morales had been running for ten months—Iglesias filed suit in this District against **Universal International Music B.V., Case No. 1:18-cv-20283 (S.D. Fla.)**. His complaint alleged that UMG had "systematically underpaid" his streaming royalties by applying a reduced rate "upon receiving a directive"—without consulting or notifying Iglesias. Iglesias called UMG's conduct *"unsupportable and unfathomable."* (Ex. S, Compl. ¶ 53, n.6.)[8]

25.     The mechanism Iglesias called indefensible when applied to him—a directive silently reducing a royalty rate without notice or authorization—is identical to the Logic Flip he implemented against Morales. On February 12, 2018—nineteen days after filing against UMG—Iglesias signed a worldwide publishing deal with Kobalt Music covering his entire song catalog, including the compositions underlying the Subject Recordings. Iglesias's UMG litigation resolved on terms reflecting a reported multimillion-dollar recovery. A May 6, 2019 article in the *Daily Business Review* quoted Iglesias's own attorney stating that royalties had been *"systematically underpaid to Universal's advantage"*—a public judicial admission, made by Iglesias's counsel while Morales's SoundExchange

_____

[8]Iglesias v. Universal Int'l Music B.V., No. 1:18-cv-20283 (S.D. Fla.), Compl. ¶ 53, n.6: "Upon receiving a directive from Universal, Interscope—without consulting or otherwise notifying Iglesias—began crediting streams at the incorrect, lower Record royalty rate." Iglesias called this "unsupportable and unfathomable." The identical mechanism—a directive silently reducing a royalty rate without notice or authorization—was applied against Morales beginning March 2017.

allocation was already suppressed, confirming that the underpayment on the very same masters was documented, litigated, and recovered by Iglesias while Morales received nothing. Under paragraph 7(c) of the Producer Agreements, Morales was entitled to his proportionate share of that recovery— approximately ***$401,000 on the documented audit underpayment alone***, before any additional UMG litigation recovery. Iglesias paid him nothing.

26. Iglesias's litigation position in Case No. 1:18-cv-20283 before this Court constitutes a binding admission directly inconsistent with any defense of the same mechanism here. His own pleading called the identical rate-substitution technique "unsupportable and unfathomable." A party cannot maintain contradictory positions in successive litigation proceedings. Judicial estoppel and the doctrine of admission both bar Iglesias from defending here what he attacked there. ***Blumberg v. USAA Cas. Ins. Co.*, 790 So. 2d 1061, 1066–67 (Fla. 2001).**

## F.  *The Catalog Sales: He Monetized What He Owed You*

27. In November 2020, Hipgnosis Songs Fund Ltd. acquired a $322.9 million portfolio from Kobalt Capital. The Iglesias catalog—including songs Morales produced—was explicitly identified in published reporting on the transaction. The "blended acquisition multiple" was 18.3x historic yearly income. That income stream included the royalties generated by Morales's production work. At the time of the Hipgnosis sale, Morales's allocation had already been suppressed from 25% to 6.25% for over three years. The asset was sold at full premium valuation while Morales's share of the income it generated was being secretly diverted. Morales received no disclosure, no reserve, and no portion of the proceeds. (Ex. U.)

28. In December 2023, Iglesias sold his entire recorded music catalog to Influence Media Partners—backed by Warner Music Group and BlackRock—for nine-figure consideration. Bloomberg News reported the transaction on December 6, 2023. Iglesias's manager Fernando Giaccardi confirmed his seller-side participation, telling Bloomberg: ***"Lylette got a bargain. We could've gotten more money if we went to more places but we didn't because it wasn't about that."*** The sale included every

*Morales v. Iglesias et al.* | Case No. _____

master recording Morales produced. Influence Media acquired not only the recordings but the royalty streams they generate—streams that, under the Producer Agreements, carry Morales's embedded 25% producer royalty interest. No disclosure was made to Morales. No reserve was established. No escrow was created. Morales's SoundExchange payments stopped entirely following the transaction.

29. By June 2024, a court-ordered Writ of Possession removed Morales from his home. (Ex. GG.) In October 2024, he obtained an emergency royalty-backed loan of $18,000 at 30% interest to secure replacement housing. In January and February 2025, he sent written demands to Universal, Iglesias, and Iglesias's management, documenting his royalty claims based on the evidence available to him at that time. On February 18, 2025—before SoundExchange had confirmed the concealed mechanism in writing—Iglesias's attorney John Branca responded: ***"Stop emailing me. You are owed nothing. Your emails constitute harassment. You need therapeutic help."*** In a separate communication, Branca wrote ***"Mitch it's time to call the FBI"***—coordinating with a third party to weaponize federal law enforcement against a pro se claimant presenting documented royalty evidence. Neither communication denied the existence of the 2005 audit, the UMG recovery, or the nine-figure catalog sale. **These losses**—the Writ of Possession, the 30% interest loan, the cessation of payments—flowed directly from the suppression of royalty income that began March 2017 and the catalog sale without any protection of Morales's interest. The FBI threat came two months before SoundExchange's April 23, 2025 written admission confirmed the concealed mechanism—meaning Branca's false denial and intimidation campaign preceded, and was designed to forestall, the very disclosure that ultimately exposed the Logic Flip. ***That sequence is evidence of consciousness of guilt: demand received, FBI threatened, concealment confirmed two months later.*** Branca's written responses cited a settlement whose Section 5 expressly preserved the very rights he claimed were extinguished.

**G. *The MLC Fork: Both Royalty Streams Blocked Simultaneously***

30.     While the Logic Flip suppressed Morales's SoundExchange performance royalties, a parallel mechanism blocked his mechanical publishing royalties. MLC Song Code E11487 correctly identifies the underlying composition with ISWC T0713269976, lists all co-writers including Morales (IPI 00189727412), and links 2,165 matched recordings. Kobalt Music Publishing America—Iglesias's own publishing administrator—administers his 50% share on E11487. MLC Song Code C3053G covers the same composition but: (i) omits the ISWC entirely; (ii) strips Morales's IPI; (iii) removes Iglesias as a writer, preventing Kobalt's 50% claim from attaching; (iv) eliminates Kobalt and Reservoir from publisher entries; (v) carries zero matched recordings; and (vi) leaves 10% of shares unattributed. (Exs. AA, BB.)

31.     C3053G was submitted through a CWR filing within the publishing administration chain associated with Iglesias's compositions—the same chain Iglesias signed to Kobalt in February 2018. Kobalt, the administrator Iglesias chose and controls, appears on the correct record and is absent from the stripped one. On January 27, 2026, Recognition Music Ltd.'s Jon Baker confirmed the precise split data in both records. (Ex. KK.) On the correct record E11487: Morales holds a 15% writer share, currently claimed by Round Hill Compositions (3.75%) and Reservoir Media Music (11.25%), while Iglesias holds 50% administered by Recognition/Kobalt. On the forked record C3053G: Morales appears at 40%, claimed entirely by Round Hill Compositions—but Iglesias does not appear as a writer at all, Kobalt does not appear as a publisher, the ISWC is absent, and zero recordings are matched. The same three co-writers appear on both records (Morales, Dioguardi, Siegel) but Iglesias's credits and Kobalt's publisher entry are stripped from C3053G entirely. Baker confirmed: ***"Round Hill and Reservoir are claiming your interest; this will be the reason that you are not seeing any revenue or claims under your own MLC portal."*** Kobalt is a witness to the fork: it administers Iglesias's publishing on the correct record and is entirely absent from the stripped one. Morales's MLC publisher account (Member ID P8155J) reflects approximately $102,000 in unrecouped publishing royalties he cannot access because Round Hill and Reservoir occupy his share on both records while his Member Hub shows no works, no match history, and no royalty history. The pattern—stripping the ISWC,

*Morales v. Iglesias et al.*  | Case No. _____

Iglesias's writer credit, Kobalt's publisher entry, all matched recordings, and redistributing shares to different claimants simultaneously—is consistent with intentional reconstruction of the composition record outside the authorized chain of title.

32. The consequence of the stripped CMI was documented in real time by four independent global platforms. In December 2025, Amazon Music (Cases 19140303041, 19140443611), Apple Music (Ref. MUS256147), Google, and YouTube each independently reviewed Morales's rights assertions regarding the Subject Recordings and removed the covered recordings from their services. (Ex. DD.) Each platform operates a rights-verification system that relies on ISWC and IPI data to match recordings to the correct composition owners and route mechanical royalties. When a DSP receives an MLC record with no ISWC, no credited co-writer IPI, and zero matched recordings—as C3053G returns—the rights chain is unverifiable and the content cannot be cleared. Amazon, Apple, Google, and YouTube did not adjudicate ownership. The stripped record made correct ownership identification technically impossible, and each platform acted accordingly. *Four independent global platforms. Same cause. Same result: the CMI had been corrupted and the recordings could not be properly cleared.* Every day those recordings were unavailable represents quantifiable lost royalties directly traceable to the removal of CMI from C3053G.

33. MLC's own correspondence establishes both actual notice and a contradicted defense. On January 15, 2026, MLC wrote that *the duplicate registration process has commenced* for E11487 and C3053G and that C3053G *will be merged* into E11487 once claimants confirm—the language of a duplicate-work procedure, not independent works. On February 11, 2026, Morales sent MLC Assistant General Counsel Nathan Osher a formal written notice of impending litigation and demand for a Legal Hold under MLC's own stated policy. (Ex. BB.) Osher responded: "There is no 'fork.'" That position is irreconcilable with MLC's own January 15 duplicate-processing initiation. Osher further stated that an ISWC and writer IPI are "not required data" for MLC registration or distribution. That is an admission of removal—not a defense to it. MLC may process distributions internally without

*Morales v. Iglesias et al.*   | Case No. _____

an ISWC; DSPs cannot match without one. Four global platforms confirmed that failure. Osher's written statement is MLC's confirmation that those identifiers were absent from C3053G.

34.     Defendants sustained the Logic Flip and the broader royalty diversion through overlapping mechanisms of concealment spanning two decades: (1) the portal displayed "25%" while paying 6.25% from March 2017 through at least April 2025—a controlled, persistent discrepancy between representation and reality (Exs. C, V); (2) *591 consecutive SoundExchange statement rows: $21,347.29 to E.I. Productions, $0.00 to Morales* were inadvertently produced and subjected to attempted claw-back (Ex. F); (3) the Bailando cross-title debits were applied without disclosure or Morales-signed authorization (Ex. D); (4) the 2005 GLF audit was suppressed for nine years; (5) Sanchez falsely represented on February 18, 2014 that the royalty matter was "settled" before any settlement existed (Ex. L); (6) UMG Director Mark Gomez told Morales in February 2020, "your money is not going to anyone else"—a statement Morales alleges was false—while Iglesias's representative Juan Carlos Sanchez was simultaneously inquiring about access to Morales's UMG royalty portal without his knowledge (Ex. X); and (7) the MLC fork stripped Morales's IPI and ISWC from C3053G, blocking mechanical royalty matching through ordinary database queries.

## I.     *Tolling, Discovery, and Continuing Wrong*

35.     Morales's claims are timely on three independent grounds, any one of which is sufficient.

36.     First and strongest: each quarterly SoundExchange distribution crediting Morales at 6.25% instead of 25% is a **separate, independently actionable wrong** that accrued on its own payment date. The ongoing routing to Influence X Music II-A LP on 33 of 34 SXIDs restarts the limitations period every quarter. No tolling doctrine is needed for any deprivation occurring within the applicable period before filing.

*Morales v. Iglesias et al.* | Case No. _____

37.    Second: Defendants are equitably estopped from invoking any limitations defense because their own affirmative concealment prevented earlier discovery. For eight years the portal displayed "25%" while the backend paid 6.25%—a misrepresentation impossible to detect without access to SXID-level data Defendants controlled. A defendant who prevents discovery through active concealment cannot invoke the limitations period that concealment created. "Nothing contained herein shall affect Morales's right to continue to receive producer royalty payments"—Iglesias's written Section 5 promise independently tolled limitations by inducing reasonable reliance that his ongoing rights were protected. ***Nardone v. Reynolds*, 333 So. 2d 25, 36 (Fla. 1976)**; ***Major League Baseball v. Morsani*, 790 So. 2d 1071, 1078 (Fla. 2001)**; ***Hearndon v. Graham*, 767 So. 2d 1179 (Fla. 2000)**. Actual discovery occurred April 23, 2025 when Lewelling confirmed in writing the unauthorized reduction. (Ex. C.)

## V.    CLAIMS FOR RELIEF

### COUNT I

### (BREACH OF CONTRACT)

(Against Iglesias)

38.    Morales realleges and incorporates by reference paragraphs 1 through 36.

39.    The Producer Agreements and the Settlement Agreement are valid and binding contracts. Morales has performed all of his obligations. Iglesias breached by:

(a)    **Logic Flip Without Dual Signature.** Beginning no later than March 2017, Iglesias caused Morales's SoundExchange allocation to be reduced from 25% to an effective 6.25% without any writing signed by Morales—in direct violation of paragraph 13's written-modification requirement and Section 5's express preservation of Morales's ongoing royalty rights. That reconfiguration was void ab initio under the contract Iglesias signed.

(b)     **Withholding the UMG Audit Recovery.** Iglesias conducted an audit of UMG, filed suit in this District in January 2018, and collected a reported multimillion-dollar recovery on the same masters Morales produced. Paragraph 7(c) of the Producer Agreements entitled Morales to his proportionate share of that recovery. Iglesias paid him nothing.

(c)     **Bailando Cross-Title Offsets.** Iglesias caused or permitted SoundExchange to apply cross-title negative-balance debits through "Bailando"—a recording Morales did not produce and that is not covered by the 2014 LOD—against Morales's account on the Subject Recordings. Those offsets are unauthorized on the face of the LOD.

(d)     **Post-Settlement Continuing Breach.** Each quarterly statement crediting Morales at 6.25% instead of 25% after July 20, 2015 constitutes a separate and continuing breach of Section 5's written preservation of his royalty rights.

**WHEREFORE**, Morales requests compensatory damages for all post-settlement breaches, pre- and post-judgment interest, costs, and further relief.[9]

## COUNT II

### (CONVERSION)

(Against Iglesias and E.I. Productions)

40.     Morales realleges and incorporates by reference paragraphs 1 through 39.

41.     Morales had, and continues to have, an immediate right to specifically identifiable royalty proceeds arising from the Producer Agreements, the 2014 LOD, and the SoundExchange distributions tied to the Subject Recordings. These proceeds were segregated at the SXID level at the point of SoundExchange distribution—traceable per statement to individual recording identifiers, not general account balances—and are therefore specifically identifiable under Florida's conversion

---

[9]Florida courts enforce unambiguous contract language as written. *DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 93 (Fla. 2013). Judicial estoppel separately bars Iglesias from defending the same rate-substitution technique he called "unsupportable and unfathomable" in *Iglesias v. Universal Int'l Music B.V.*, No. 1:18-cv-20283 (S.D. Fla.).

*Morales v. Iglesias et al.* | Case No. _____

doctrine. Defendants wrongfully exercised dominion and control over those proceeds by causing Morales's allocation to be reduced from 25% to 6.25%, diverting the differential, routing $21,347.29 to E.I. Productions instead of Morales, and maintaining altered routing after notice and demand. On the December 2022 statement alone, Morales received $137.57 against the $550.27 he was owed—a $412.70 single-statement diversion. Applied across 34 SXIDs every quarter from March 2017 through the present, the converted amount is substantial. (Exs. D, F, Z.) Florida recognizes conversion of specifically identifiable money traceable through identifiable payment streams. ***Futch v. Head*, 511 So. 2d 314 (Fla. 1st DCA 1987)**; ***Gasparini v. Pordomingo*, 27 So. 3d 159 (Fla. 3d DCA 2010).**

**WHEREFORE**, Morales requests judgment for all converted amounts, pre- and post-judgment interest, costs, and further relief.

**COUNT III**

**(VIOLATION OF 17 U.S.C. § 1202)**

(Against Iglesias and Does 1–10)

42.    Morales realleges and incorporates by reference paragraphs 1 through 41.

43.    Morales is an author and co-writer of compositions underlying the Subject Recordings. Congress has confirmed that ISWC and IPI are not optional administrative fields. 17 U.S.C. § 115(e)(31) expressly defines musical work information to include the international standard musical work code, and the Copyright Office implementing regulations for the Mechanical Licensing Collective include ISWC and IPI numbers as required elements of that statutory definition. When Congress enacted the Music Modernization Act, it built the statutory licensing database around these exact identifiers. Stripping them is not altering random metadata—it is removing the specific identifiers Congress designated as the core routing infrastructure of the statutory mechanical licensing system. The following information in MLC Song Code E11487 constitutes copyright management information ("CMI") within the meaning of 17 U.S.C. § 1202(c):

*Morales v. Iglesias et al.* | Case No. _____

(i) *ISWC T0713269976—an "identifying number or symbol referring to" the work within the meaning of § 1202(c)(7), and the machine-readable key that enables DSPs and the MLC to match a streaming event to the correct composition and route mechanical royalty payment to the credited co-writers;*

(ii) *Morales's name and IPI number (00189727412)—"the name of, and other identifying information about, the author" within the meaning of § 1202(c)(2);*

(iii) *Publisher ownership entries and percentage allocations—"the name of, and other identifying information about, the copyright owner" and "terms and conditions for use of the work" within the meaning of § 1202(c)(3) and § 1202(c)(5); and*

(iv) *Work title and composition-identifying data linking E11487 to 2,165 matched recordings—"the title and other information identifying the work" within the meaning of § 1202(c)(1).*

44.    MLC Song Code C3053G covers the same composition family as E11487 but was submitted through the publishing administration chain associated with Iglesias's compositions—the same chain he signed to Kobalt Music Publishing America in February 2018. C3053G: (i) omits the ISWC T0713269976 entirely, removing the § 1202(c)(7) identifying number; (ii) strips Morales's IPI 00189727412 and writer credit, removing the § 1202(c)(2) author-identifying information; (iii) eliminates publisher entries and substitutes different ownership allocations, altering the § 1202(c)(3) and (c)(5) copyright-owner and terms information; and (iv) severs the composition from 2,165 matched recordings, removing the work-identifying linking data. (Exs. AA, BB.) Kobalt—Iglesias's own chosen administrator, whose professional function is CWR filing and royalty routing—administers 50% of Iglesias's publishing share on the correct record and is absent from C3053G entirely.

45.    **Violation of § 1202(b)(1)—Removal and Alteration.** In violation of 17 U.S.C. § 1202(b)(1), defendants intentionally removed and altered the foregoing categories of CMI without the authority of Morales, the copyright owner, or the law. C3053G was submitted by a person or entity with access to the correct record E11487 who affirmatively omitted the ISWC, stripped Morales's IPI

*Morales v. Iglesias et al.* | Case No. _____

and writer credit, removed publisher entries, and reassigned ownership shares. A single clerical error might produce one discrepancy. It does not simultaneously remove four independent statutory CMI categories while producing a record with zero matched recordings alongside a correct record with 2,165. The simultaneous, coordinated removal of multiple CMI categories from a professionally submitted CWR filing supports the inference that the removal was knowing within the meaning of § 1202(b)(1).

46.     **Violation of § 1202(b)(3)—Distribution After Notice.** In violation of 17 U.S.C. § 1202(b)(3), defendants distributed, and caused the distribution of, copies of works knowing that CMI had been removed or altered without authority. After Morales raised the forked-work condition with the MLC in December 2025, the stripped record C3053G was not corrected, merged, or withdrawn. It remained in active distribution through the MLC's statutory database. Each query of the MLC database returning C3053G constitutes a distribution of a work with knowingly altered CMI. That post-notice continuation of distribution is the core § 1202(b)(3) violation.

47.     **Scienter—Knowledge That Removal Facilitates and Conceals Infringement.** Under ***Victor Elias Photography LLC v. Ice Portal, Inc.*, No. 21-11892 (11th Cir. 2022)**, and ***Stevens v. Corelogic, Inc.*, 899 F.3d 666 (9th Cir. 2018)**, defendants must have known that removal or continued distribution would induce, enable, facilitate, or conceal infringement. That standard is met: (a) Kobalt—a professional publishing administrator—knows that stripping an ISWC from a CWR submission causes DSPs to fail the composition match; (b) whoever submitted C3053G had access to E11487 and chose not to include the CMI; (c) after formal notice of the fork in December 2025, C3053G was not corrected; and (d) Amazon Music, Apple Music, Google, and YouTube removed the covered recordings, confirming the matching failure. (Ex. DD.) The simultaneous removal of four independent CMI categories is the affirmative pattern or modus operandi satisfying second scienter under ***Victor Elias***. Under ***Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171–72 (2d Cir. 2020)**, concealment of a defendant's own infringement satisfies the statute—C3053G concealed Iglesias's unauthorized exploitation of Morales's co-writer interest. ***Energy Intelligence Grp. v. Kayne***

*Morales v. Iglesias et al.*  | Case No. _____

*Anderson Capital Advisors*, **948 F.3d 261, 277 (5th Cir. 2020)** (scrubbing identifying labels to avoid detection satisfies § 1202's integrity-protection purpose).

48.      The post-notice conduct confirms the § 1202(b)(3) scienter finding. On April 1, 2026, this action was served on BMI. On *April 2, 2026—one day later*—the MLC's Publisher Services confirmed in writing: "We have made the necessary corrections to match ISRC USIR10211723 to 'MAYBE' MA4YP7, and ISRC USIR10120233 to 'MAYBE' M21606." (Ex. BB.) "MAYBE" is a Subject Recording Morales produced for the *Escape* album. Before April 2, 2026, those ISRCs were not correctly matched to the composition in the MLC's statutory database—meaning streaming events were not routing mechanical royalties to the correct co-writers. The MLC confirmed the corrections would not appear in statements until July 2026, meaning prior statement periods had incorrect royalty routing. Corrections made one day after formal service of this action—not by ordinary maintenance—establish that parties monitoring the litigation were actively interacting with Subject Recording metadata immediately after formal notice of Morales's attribution claims. That is knowing distribution after notice under § 1202(b)(3).

49.      Morales's § 1202 claim is timely as a **continuing violation**—C3053G is distributed anew each time a DSP or the MLC processes a composition query, and each such distribution constitutes an independent violation accruing on its date. The claim is also timely from December 2025 under the discovery accrual rule. To the extent a timely § 1202 claim is established, ***Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 327 (2024)**), holds that there is no separate damages cap limiting recovery to three years—the Court assumed without deciding that the discovery rule applies to copyright claims, and held that a timely claim is not so limited.

**WHEREFORE,** Morales requests statutory damages of $2,500–$25,000 per violation per work under 17 U.S.C. § 1203(c)(3)(B), enhanced for willfulness, permanent injunctive relief requiring correction and merger of C3053G into E11487, attorneys' fees under § 1203(b)(4)– (5), and further relief.

*Morales v. Iglesias et al.* | Case No._____

## COUNT IV

### (EQUITABLE ACCOUNTING)

(Against Iglesias and E.I. Productions)

50.     Morales realleges and incorporates by reference paragraphs 1 through 44.

51.     Morales is entitled to a complete equitable accounting because the Producer Agreements and the Settlement Agreement impose express accounting and payment obligations that Iglesias has not honored. A legal remedy is inadequate because Morales cannot determine the full amount of diverted funds without compelled disclosure of records outside his control: the GLF audit recovery and how it was allocated; internal SoundExchange histories of allocation changes and the identity of who submitted the March 2017 reconfiguration; payee-routing records; negative-balance applications; and the financial terms of both the 2020 Hipgnosis and 2023 Influence Media catalog transactions. The Lewelling April 23, 2025 admission confirms operative records exist. SoundExchange's March 19, 2026 admission that it cannot locate the LOD confirms the custodial records are at risk. Morales's UMG ledger shows $1,283,448.62 in payments from 2000 to 2011 followed by abrupt collapse—a pattern that compelled production will explain.

**WHEREFORE**, Morales requests a complete verified accounting of all royalties, proceeds, offsets, debits, credits, transfers, recoupments, and related payments on the Subject Recordings from inception to the present.

## COUNT V

### (FRAUD AND FRAUDULENT CONCEALMENT)

(Against Iglesias and E.I. Productions)

52.     Morales realleges paragraphs 1 through 51 and further alleges:

53.     Iglesias and E.I. Productions committed fraud and fraudulent concealment through six specific acts. Each allegation identifies the speaker, the specific statement or omission, the date or tight

*Morales v. Iglesias et al.*   | Case No. _____

time window, the reason the statement was false when made, and the concrete harm Morales suffered in reliance.

(a) ***Mohr "No Monies Recovered" Misrepresentation — December 2013 and April 2014.*** The speaker: Jeremy Mohr, Esq., Iglesias's counsel, acting within the scope of his authority as Iglesias's representative. The statement: on or about December 19, 2013, Mohr wrote to Morales's counsel that "there were no monies recovered in connection with these particular masters" in connection with Iglesias's UMG audit. Mohr repeated the substance of that representation in or about April 2014 in response to Morales's $800,000 demand. (Ex. JJ.) The falsity: the December 14, 2005 GLF audit report—prepared at Iglesias's direction by Gelfand, Rennert & Feldman—documented substantial underpayments on those same masters. Iglesias knew the audit existed, knew its findings, and caused or ratified Mohr's false denial. The reliance: Morales's counsel accepted a $140,000 settlement in July 2015 in part because Iglesias's side had repeatedly represented that the audit found no recoverable amounts. Had Mohr's representation been true, the settlement would have been the correct economic outcome. It was not true, and the settlement was procured by that falsehood.

(b) ***Sanchez "Already Settled" Misrepresentation — February 18, 2014.*** The speaker: Juan Carlos Sanchez, Iglesias's business manager, identified in writing by Iglesias's own counsel as the "SoundExchange point man" for Iglesias's account, acting within the scope of his authority. The statement: on February 18, 2014, Sanchez sent a written communication to Morales's counsel representing that the royalty matter was "settled." (Ex. L.) The falsity: no settlement existed on February 18, 2014. The parties did not execute a settlement until July 20, 2015—seventeen months later. The statement was false when made. The purpose: to induce Morales's counsel to stand down from active negotiation of the LOD and royalty demands at the precise moment Iglesias was finalizing the LOD terms. The reliance: Morales's counsel rejected the false representation and continued negotiations, but the misrepresentation is evidence of the deliberate pattern of false statements made to suppress and delay Morales's royalty claims.

*Morales v. Iglesias et al.*   | Case No. _____

(c)     ***Section 5 Written Promise — July 20, 2015, Followed by Concealed Reconfiguration — March 2017.*** The speaker: Iglesias personally, as the signatory to the Settlement Agreement. The statement: Section 5 of the Settlement Agreement, executed July 20, 2015, provides in writing: "Nothing contained herein shall affect Morales's right to continue to receive producer royalty statements and producer royalty payments under the producer agreements with Iglesias." (Ex. Q, § 5.) The falsity: within twenty months of signing that promise, Iglesias caused or permitted the March 2017 Logic Flip that reduced Morales's SoundExchange allocation from 25% to an effective 6.25%— destroying the economic value of the very royalty payments Section 5 promised to protect. Critically, at the time Section 5 was signed on July 20, 2015, Iglesias already: (i) had exclusive control over the artist-side SoundExchange administration structure through which the March 2017 reconfiguration was later submitted; (ii) had identified Juan Carlos Sanchez as his SoundExchange point man before settlement; and (iii) had possessed the 2005 GLF audit findings for nine years while negotiating a below-value settlement. These facts support a plausible inference of **present intent not to perform** at the time Section 5 was executed. The reliance: Morales accepted $140,000 in settlement of an $800,000 documented claim and dismissed his lawsuit with prejudice in direct reliance on Section 5's written assurance. He then took no further legal action for nearly a decade, reasonably believing his ongoing royalty rights were protected. They were not.

(d)     ***Two-View Portal Misrepresentation — March 2017 Through April 2025.*** The speaker: Iglesias and/or persons acting at his direction through the artist-side SoundExchange administration structure. The statement: from no later than March 2017 through at least April 23, 2025, the SoundExchange portal displayed "25%" as Morales's allocation while the backend paid an effective 6.25%—a controlled, persistent eight-year discrepancy between representation and reality. (Exs. C, V.) The falsity: Lewelling confirmed in writing that Morales was receiving only 25% of Iglesias's 25% share—effective 6.25%—retroactively applied, with no Morales-signed authorization. The December 2022 statement alone shows $137.57 paid against $550.27 owed. The reliance: Morales saw "25%,"

*Morales v. Iglesias et al.*  | Case No._____

had no access to SXID-level allocation data, took no legal action for eight years, and the 2023 catalog sale occurred while the portal was lying to him.

(e)     ***Affirmative Concealment of the Audit Records and Routing Data — 2014 Through Commencement.*** The speakers: Iglesias through counsel Branca and manager Giaccardi. The omission: each confirmed possession of the December 14, 2005 GLF audit materials documenting royalty underpayments on the Subject Recordings and refused to produce them, despite Morales's contractual entitlement under paragraph 7(b). The duty: under Florida law, a party with superior knowledge of material facts must disclose where the other party cannot discover them through ordinary diligence. ***Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985)**. Iglesias possessed the complete audit findings, the SoundExchange routing history, and the allocation change logs. Morales had none. The harm: Morales settled for $140,000 without knowing the true underpayment scope, and was unable to discover the Logic Flip for eight years because the records proving it were in Iglesias's exclusive possession.

(f)     ***Branca False Denial and FBI Intimidation — February 18, 2025.*** The speaker: John Branca, Esq., Iglesias's attorney. After Morales sent documented royalty demands, Branca responded: *"Stop emailing me. You are owed nothing. Your emails constitute harassment. You need therapeutic help."* In a separate communication: *"Mitch it's time to call the FBI"*—coordinating with a third party to weaponize federal law enforcement against a pro se claimant. The falsity: "you are owed nothing" was false. Section 5 preserved Morales's royalty rights; Lewelling later confirmed the unauthorized reduction in writing. The timing: the FBI threat came February 18, 2025—two months before Lewelling's April 23, 2025 written admission. Branca's intimidation was designed to silence Morales before that confirmation could be obtained. Neither communication denied the 2005 audit, the UMG recovery, or the nine-figure catalog sale. ***The FBI threat came before the proof. That is suppression.***

54.     Each of the six fraud events above is independently actionable. Together they establish a two-decade pattern of deliberate misrepresentation directed at suppressing Morales's royalty claims

*Morales v. Iglesias et al.* | Case No. _____

while monetizing the asset that generated them. Morales relied on Mohr's denial (settling $800,000 claim for $140,000), on Sanchez's false "settled" statement (delaying further demands), on Section 5's written promise (dismissing his lawsuit with prejudice), on the portal's 25% display (taking no legal action for eight years), and on Iglesias's concealment of the audit records (remaining unable to discover the Logic Flip). Branca's February 2025 FBI threat was designed to silence him before Lewelling's written confirmation surfaced. As a direct result, Morales suffered the full differential from March 2017 forward, loss of approximately $401,000 in documented audit recovery, forced distress borrowing at 30% interest, and loss of his home. ***Russ v. TJX Cos.*, 346 So. 3d 654, 660 (Fla. 4th DCA 2022)**; ***Johnson v. Davis*, 480 So. 2d 625, 628 (Fla. 1985).**

**WHEREFORE,** Morales requests compensatory damages, punitive damages, rescission of any instrument procured through fraud, and further relief.

## COUNT VI

## (UNJUST ENRICHMENT)

(Against Iglesias, in the Alternative)

55.     Morales realleges and incorporates by reference paragraphs 1 through 54.

56.     In the alternative, to the extent the Court finds any portion of the challenged benefits falls outside enforceable contractual remedies, Morales pleads unjust enrichment under Fed. R. Civ. P. 8(d)(3). Iglesias was unjustly enriched by: (i) the Logic Flip differential—18.75% of Featured-Artist royalties diverted every quarter from March 2017 through the present; (ii) the 2020 Hipgnosis acquisition proceeds representing the capitalized value of royalty streams that included Morales's suppressed producer interest, sold at an 18.3x multiple; (iii) the 2023 Influence Media nine-figure consideration for the entire catalog including masters Morales produced; and (iv) the UMG audit recovery Morales never received his contractual share of. Morales conferred all of these benefits

*Morales v. Iglesias et al.* | Case No._____

through his production work—the creative labor that generated the value Iglesias captured, monetized, and retains.[10]

**WHEREFORE**, Morales requests disgorgement, imposition of a constructive trust over all catalog sale proceeds and diverted royalties traceable to the Subject Recordings, and further equitable relief.

## VI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Steve Morales respectfully requests that this Court enter judgment in his favor and against Defendants, and award:

(a)     Compensatory damages for the 25%-to-6.25% allocation differential on all 34 SXIDs, every quarter from March 2017 through the present—illustrated by the December 2022 statement: $137.57 paid against $550.27 owed, a $412.70 single-quarter shortfall;

(b)     Recovery of the $21,347.29 E.I. Productions diversion documented in 591 SoundExchange statement rows;

(c)     Recovery of Morales's proportionate share of the UMG audit recovery under paragraph 7(c) of the Producer Agreements—a minimum of *$401,000* based on Morales's 53.8% track contribution to *Escape* applied to the $682,134–$745,502 in documented underpaid royalties, plus his proportionate share of any additional recovery Iglesias obtained from his 2018 UMG litigation, the full amount to be established through compelled production and accounting;

---

[10]A constructive trust is appropriate where property is retained through fraud or breach of fiduciary duty. *Quinn v. Phipps*, 93 Fla. 805 (Fla. 1927); *Capital Bank v. MVB, Inc.*, 644 So. 2d 515 (Fla. 3d DCA 1994). The catalog sale proceeds are traceable to recordings encumbered by Morales's contractual producer royalty interests, monetized twice—in 2020 and 2023—without disclosure or reserve.

*Morales v. Iglesias et al.* | Case No. _____

(d)      Recovery of approximately $102,000 in unrecouped mechanical publishing royalties blocked by the C3053G identity fork;

(e)      Imposition of a constructive trust over: (i) the Logic Flip differential from March 2017 through the present; (ii) proceeds from the 2020 Hipgnosis and 2023 Influence Media catalog transactions to the extent traceable to Morales's suppressed producer royalty interest; and (iii) the UMG audit recovery;

(f)      Statutory damages under 17 U.S.C. § 1203(c)(3)(B) of $2,500–$25,000 per violation per work, enhanced for willfulness;

(g)      A complete equitable accounting from inception to the present;

(h)      Declaratory judgment that the LOD is valid, the March 2017 reconfiguration void, the Bailando debits unauthorized, and corrective directions required;

(i)      Preliminary and permanent injunctive relief requiring restoration of Morales's 25% allocation on all 34 SXIDs and prohibiting further modification absent a writing signed by Morales;

(j)      Punitive damages to the extent permitted by law;

(k)      Attorneys' fees and costs under 17 U.S.C. § 1203(b)(4)–(5) and the Producer Agreements;

(l)      Pre- and post-judgment interest at the maximum legal rate.

(m)      Relief based on spoliation or destruction of relevant records; and

(n)      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable under the Seventh Amendment to the United States Constitution.

*Morales v. Iglesias et al.* | Case No. _____

## VERIFICATION

I, **Steve Morales**, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

I further declare as follows:

1.  I have never signed any written instrument authorizing the reduction of my SoundExchange allocation from 25% to 6.25%.

2.  No such signed instrument exists because I never executed one.

3.  Enrique Iglesias signed the April 17, 2014 Letter of Direction directing payment of 25% of Featured-Artist royalties on the Subject Recordings to me or my designated payee, and I am not aware of any written revocation signed by me authorizing the reduction challenged in this action.

4.  No person or entity was authorized by me to modify, reduce, revoke, or otherwise alter the allocation established by the April 17, 2014 Letter of Direction.

5.  I did not authorize any intermediary payee entity to receive or retain my SoundExchange royalties except as expressly authorized by me in writing.

*Executed on: April 7, 2026, in Miami-Dade County, Florida.*

**STEVE MORALES**
Plaintiff, Pro Se
22902 SW 114th Path
Miami, Florida 33170
Telephone: (310) 804-8169
Email: mrmorales@me.com